FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

SEP 2 6 2016

JAMES N. HATTEN, Clerk
BY: _____ Deputy Clerk

## UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA ATLANTA DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION and STATE OF GEORGIA, <br><br> Plaintiffs, <br><br> v. <br><br> LAPTOP & DESKTOP REPAIR, LLC, a Nevada limited liability company, also d/b/a cashforiphones.com, cashforlaptops.com, ecyclebest.com, smartphonetraders.com, sell-your-cell.com; and VADIM OLEGOVICH KRUCHININ, also a/k/a Vadim Kruchin, David Kruchin, David Vadim Kruchin, Dave Kruch, as the owner and an officer of Defendant Laptop & Desktop Repair, LLC, <br><br> Defendants. | Case No. <br><br> **1:16-CV-3591** <br><br> FILED UNDER SEAL |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR A TEMPORARY RESTRAINING ORDER, ASSET FREEZE, IMMEDIATE ACCESS, APPOINTMENT OF A RECEIVER, AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE

## (FILED UNDER TEMPORARY SEAL)[1]

---

[1] Motion to seal filed concurrently.

## I.    INTRODUCTION

Since at least 2011, Laptop & Desktop Repair, LLC ("LDR" or the "Company"), and its principal, Vadim Kruchinin, have perpetrated a deceptive "bait and switch" scam, promising high payments for consumers' used electronic devices, but once received, paying a fraction of the promised amounts. Consumers who then wish to reject the revised quote and have their devices returned to them find that LDR fails to live up to its promises of a "hassle-free experience." LDR requires consumers to contact them by phone but routinely fails to answer the phone, keeps consumers on hold for extended periods, or hangs up the phone on consumers. Because of their deceptive practices, consumers have filed thousands of complaints with the Federal Trade Commission, the Office of the Georgia Attorney General, the Better Business Bureau ("BBB"), and other state and federal agencies.

Plaintiffs FTC and State of Georgia offer evidence in support of this motion that leaves little doubt that Defendants are presently engaged in the conduct alleged in the Complaint and described in this Motion and are thus violating Section 5(a) the Federal Trade Commission Act ("FTC Act") and Section 10-1-391(a) of the Georgia Fair Business Practices Act ("FBPA"). Plaintiffs' evidence also establishes that preliminary injunctive relief is necessary to put a halt to Defendants' business practices and prevent Defendants from hiding fraudulently obtained assets and

destroying evidence. In the light of this evidence, described in detail below, Plaintiffs respectfully request that the Court issue an *ex parte* temporary restraining order including an asset freeze, immediate access, appointment of a receiver, and order to show cause why a preliminary injunction should not issue.

## II. DEFENDANTS' BUSINESS PRACTICES

Tens of thousands of consumers have sold their used electronic devices to LDR through its numerous websites since 2011.[2] LDR induces customers to sell their used devices to the Company with promises of high payments and fast, easy, and hassle-free experiences.[3] Once LDR receives used electronic devices from consumers, it then repackages, reconditions, repairs, or dismantles them for resale at a profit on Internet sites such as eBay.com and Newegg.com, among others.[4]

### A. *LDR Rarely, if Ever, Pays the Quoted Amounts to Consumers.*

Consumers receive purchase offers from LDR through a price-quote engine on the Company's websites. LDR requires the consumer to input two categories of information: (a) the type of device (e.g., Apple iPhone 6) and (b) the condition of the device. For the condition of the device, LDR allows consumers to indicate only

---

[2] (App. 1180; App. 375, ¶ 19.) LDR's other websites include smartphonetraders.com, cellphonecity.com, laptopaid.com, laptopheaven.com, laptopsintocash.com, laptopxyz.com, peijian.com, ecyclewireless.com, and sell-your-cell.com. LDR also uses various "cash for-" websites, including cashforapples.com, cashforberrys.com, cashforiphones.com, cashforprinters.com, cashforlaptops.com, cash4laptops.com, and cashforipads.com. (App. 1171-72, ¶ 10)

[3] (App. 408; App. 382, ¶ 10(b); App. 386, ¶ 15(b))

[4] (App. 817, ¶ 6-17; App. 1047, ¶¶ 3-4)

whether the device (i) has a cracked screen, (ii) has a bad battery, or (iii) will not power on.[5] LDR, however, does not provide consumers an opportunity to input information about a device's cosmetic condition, such as scratches or dents.[6]

Based on the information submitted, the Company's websites instantly generates a price quote (the "Quote").[7] LDR's websites typically attempt to qualify the Quote by stating that "depending on the condition of your [device]" LDR will pay "as much as" the Quote.[8]  But certain of LDR's websites represent that the Quote is, in fact, the amount consumers will receive.  For example, several of LDR's websites promise that, by inputting only the information requested, consumers will "Get a final quote" for their devices.[9]  Other websites advertise that consumers will "[r]eceive the cash promised in your quote"[10] or "[o]ur customers can expect to receive the exact amount we quote."[11]  LDR also tells consumers that it will pay "as soon as we confirm the condition of your [device] and payout amount (via e-mail or telephone)."[12] Moreover, LDR often communicates with consumers

---

[5] (App. 14, ¶ 4; App. 19; App. 63, ¶¶4-5; App. 225; App. 369, ¶ 40; App. 1093:1-11)
[6] (App. 63-64, ¶ 5; App. 225, ¶ 345; App. 387, ¶ 16, App. 1093:1-11)
[7] (id.)
[8] (App. 186, 225)
[9] (App. 386, ¶ 15(b))
[10] (App. 382, ¶ 12(a))
[11] (App. 381-382, ¶ 10(b))
[12](App. 381, ¶ 10)

who accept the Quote, but who do not immediately mail their devices to the Company, reinforcing that LDR will pay the Quote.[13]

Many consumers expect to receive the Quote, or an amount reasonably near the Quote,[14] based on (i) their net impression of the Company's representations[15] and (ii) the condition they perceived their devices to be in.[16]  A typical example is one Georgia complainant who stated that because her phone was practically new, less than six months old, and in great condition, she expected that it would pass LDR's inspection and, consequently, LDR would pay her the initial quote of $395, or an amount very close to it.[17]  Instead, she received a revised offer of just $31.[18]

Some consumers' expectations were also shaped by LDR's Quote engine: these consumers considered what the Company was deducting from the Quote for serious defects like a cracked screen or a dead battery and used this information to estimate that LDR would deduct much less for minor defects, like scratches or dents, that the Company did not even ask about through the price-quote engine.[19] For example, using LDR's price-quote engine, a Georgia complainant received a

---

[13](App. 32, ¶ 5; App. 102, ¶ 5; 303, ¶ 6)
[14](App. 147-48, ¶ 5; App. 247, ¶ 5; App. 257, ¶ 4; App. 271-72, ¶ 5; App. 285, ¶ 3; App. 335, ¶ 6)
[15](App. 32, 5; App. 102, ¶ 5, App. 1175-1176, ¶ 23; App. 1179-1180, ¶¶ 37-39; App. 1183, ¶ 50)
[16](App. 220, ¶6-App. 221, ¶9; App. 178, ¶ 5; App. 192, ¶ 6)
[17](App. 192, ¶ 6)
[18](App. 193, ¶ 9)
[19] (App. 101, ¶ 4; 288, ¶ 10)

5

price quote of around $155 for an iPhone with a cracked screen.[20] Out of curiosity, he also used the engine to generate a quote of $45 more for an iPhone of the same model without a cracked screen.[21] After shipping his phone to LDR, the consumer was surprised to receive a payment of only $17 from LDR.[22] He was surprised because, apart from the cracked screen, his phone was in excellent condition.[23] His surprise is understandable because, even if LDR quibbled about whether his phone was otherwise perfect, any minor defects should not have diminished the value of the phone as much its cracked screen. But that was not the case; LDR had deducted an additional $138 for no apparent reason while the cracked screen has diminished its value by only $45.[24]

Indeed, after consumers mail their used devices to LDR, LDR virtually always revises the original Quote downward,[25] and pays consumers only a small fraction of the original amount (the "Revised Offer").[26] In small print buried in the "Terms and Conditions" on some of its websites, LDR sometimes indicates that it bases its Revised Offers on inspections of the devices;[27] however, this is not true.[28]

---

[20] (App. 101, ¶ 4)
[21] (*Id.*)
[22] (App. 102, ¶ 7)
[23] (*Id.*)
[24] (*Id.*)
[25] (App. 1175-1176, ¶ 26; App. 1179, ¶ 31;  App. 369, ¶8-App. 371, ¶9)
[26] (*Id.*)
[27] (App. 296)

Four former LDR employees have stated that LDR uses arbitrary methods to dramatically reduce the Revised Offer.[29]   For example, prior to June 2014, LDR inspected devices, made deductions purportedly based on those inspections, *and then multiplied the remainder by sixty percent*.[30] Thus, even if LDR found no defects from the inspection, the Revised Offer was never more than sixty percent of the Quote.[31] Moreover, according to former employees, in or around June 2014, after employing a consultant to determine ways to maximize the Company's revenue, the Company began a new method of computing Revised Quotes that further reduced the amount paid to consumers.[32] Under this methodology, *LDR arbitrarily started with a figure that was approximately half the Quote* and then made additional deductions purportedly based on the condition of the device.[33] This reduced starting point for additional deductions became known internally at LDR as the "maximum price for product" or "MPP."[34]   As the name implies, the Revised Quote will not exceed the MPP.[35]   In fact, the Revised Quote was routinely much

---

[28] (App. 369, ¶8-App. 371, ¶9.; App. 908:15-909:18; App. 954:26-956:25; App. 1093:12-1094:13)
[29] (*Id.*)
[30] (App. 369-370, ¶8)
[31] (*Id.*)
[32] (*Id.*)
[33] (App. 370, 9; App. 980, ¶¶ 19-25)
[34] (App. 369, 8)
[35] (App. 371-372, ¶ 11)

less, often being only three to ten percent of the Quote. [36] For example, one declarant received a quote of $207 in early 2015 for a used Apple iPhone 5 in "near-perfect" condition but received a payment of only $16 from LDR.[37]

In short, LDR's Quotes are merely the "bait" in the Company's "bait and switch" scheme.[38] LDR has repeatedly admitted to the BBB that it does not pay the quoted amounts for used devices,[39] and many consumers state that if they had known they wouldn't receive the Quote or an amount close to the Quote, they never would have sent their device to LDR.[40]

## B.    LDR Misrepresents That Consumers Are Allowed to Reject the Revised Offers and Get Their Devices Returned.

On its websites, LDR represents that a consumer may reject LDR's Revised Offer and get the device returned.[41] To do so, the consumer must telephone LDR's Purchasing Department within a narrow timeframe (usually, three or five days) after LDR e-mails the Revised Offer to the consumer (the "Rejection Period").[42] However, LDR's offer to return the device is largely illusory because LDR makes it very difficult to speak with its Purchasing Department by telephone during the

---

[36] (*Id.*)

[37] (App. 31,¶ 3-App. 32, ¶ 7)

[38] (App. 1175-1176, ¶ 26)

[39] (App. 1178, ¶ 31; App. 1183, ¶ 50)

[40] (App. 149, ¶ 13; App. 179, ¶ 12; App. 204, ¶ 8; App. 225, ¶ 15)

[41] (App. 455, ¶ I; App. 479, ¶ I; App. 568, ¶ I)

[42] (App. 65, ¶ 7; App. 371, ¶ 10)

Rejection Period, so that most consumers are unable to reject the Revised Offer and get their devices back.[43]

For example, LDR typically closes its Purchasing Department on weekends but counts Saturdays and Sundays as part of the Rejection Period.[44] Likewise, LDR often frustrates consumers' attempts to get their devices returned by placing consumers on hold for long periods or by disconnecting their calls.[45] In fact, numerous consumers have reported spending hours attempting to contact LDR's Purchasing Department and experiencing a repeated pattern of LDR placing them on hold for long periods of time, transferring the consumers' calls, and eventually hanging up on them.[46] For the small percentage of consumers who ultimately are able to reach LDR's Purchasing Department by telephone within the Rejection Period, LDR generally refuses to return devices.[47]

## C.    Despite Consumer Complaints and a Court Order Enjoining Defendants, They Have Continued Their Deceptive Practices.

Consumers have lodged more than 3500 complaints against LDR with the FTC, State Attorneys General and other state authorities, and the BBB.[48] Because of

---

[43] (App. 16, ¶ 12; App. 372, ¶ 12)

[44] (App. 183-184, ¶ 7; App. 373, ¶ 13; App. 928:20-929:11.)

[45] (App. 16, ¶ 12; App. 32, ¶¶ 7-8; App. 51, ¶ 5; App. 56, ¶ 7, App. 69, ¶ 6; App. 78, ¶ 6; App. 183, ¶ 6)

[46] (Id.)

[47] (App. 33, ¶ 9; App. 51, ¶ 6; App. 56-57, ¶ 8; App. 184, ¶ 10; App. 194, ¶¶ 10-11)

[48] (App. 378, ¶ 5; App. 1172, ¶ 12)

the numbers of complaints it was receiving, the BBB in June 2011 sent a letter to

LDR concerning 61 complaints that it had received that clearly identified the

Company's wrongdoing:

> We have determined that a majority (88%) of the disputes ...
> allege the Business has provided misleading quotes for
> consumers' electronic devices. Almost all of these consumers
> believed they were victims of a 'bait and switch' tactic.
> Consumers allege the Business obtains their interest by offering
> a high quote and then lowers the quote upon the Business'
> receipt of the device. ... Also significant in our review is that
> 24% of the disputes allege difficulty in communicating with the
> Business.[49]

Several media outlets, including *Good Morning America* and Atlanta's CBS 46,

have documented the Company's deceptive business practices.[50]

In March 2015, at a hearing before the First Judicial District Court for the

State of Nevada, Defendants stipulated that the "attorney general had reason to

believe that Defendants were or have been engaging in a deceptive trade practice

based on complaints filed by consumers."[51] The court then enjoined Defendants

from: (1) making false representations in the course of business in violation of NRS

598.0915(15); (2) engaging in any act of false advertising in violation of NRS

---

[49] (App. 1175, ¶ 23)

[50] (App. 1161-1162, ¶ B; *see, e.g.,* http://tinyurl.com/zo6ooqh and
http://www.cbs46.com/story/29018321/cash-for-iphones-site-promises-deal-delivers-dud).)

[51] (App. 1236:13-25.) At this hearing on a Petition for Order Compelling Compliance with a
Subpoena *Duces Tecum*, Defendants also admitted that they had not complied with the subpoena
served on them by the State of Nevada Office of the Attorney General. (App. 1236:22-25)

207.171; and (3) making false statements to induce customers to deliver any device or merchandise in violation of NRS 205.0832(1)(c).[52]

Despite the Nevada state court's order, Defendants continue to engage in their deceptive business practices, as evidenced by the continued influx of complaints filed by consumers against LDR, including the over 100 complaints filed against LDR since February 2016.[53]  Moreover, after the March 2015 Order, Defendants have taken efforts to conceal their scam.[54]  The Company has created new websites, which it has not linked to its previous websites.[55]  And while LDR formerly used its business address on its websites, LDR's newer websites now use mailbox drops, such as UPS Stores, to hide its business address.[56]

### III.   ARGUMENT AND CITATION OF AUTHORITY

#### A.   *A Temporary Restraining Order is Necessary to Prevent Defendants From Continuing to Perpetrate Their Scam.*

This Court may issue a temporary restraining order to prevent a defendant from violating the FTC Act, where, as here, the FTC seeks a temporary restraining order as part of a civil action seeking permanent injunctive relief.  *See* 15 U.S.C. § 53(b) (second proviso, "Provided further, That in proper cases the Commission

---

[52] (App. 1236:13-25)
[53] (App. 1185, ¶ 57)
[54] (App. 1183, ¶ 15)
[55] (*Id.*)
[56] (App. 1183, ¶ 15; 385, ¶ 14)

11

may seek, and after proper proof, the court may issue, a permanent injunction."). Indeed, the full range of this Court's inherent equitable powers may be employed during the pendency of an action for permanent injunctive relief. *FTC v. Gem Merch. Corp.,* 87 F.3d 466, 468 (11th Cir.1996).

Unlike private litigants, the FTC, an independent regulatory agency, need not demonstrate irreparable injury in order to obtain injunctive relief. *FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228, 1232 (11th Cir. 2014). It is subject to a lighter burden. Accordingly, in order to obtain a temporary restraining order (or a preliminary injunction),[57] the FTC must show only that (1) it is likely to succeed on the merits, and (2) injunctive relief is in the public interest. *Id.*

### 1.   Plaintiffs are Likely to Succeed on the Merits of Their Claims.

Section 5 of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). Conduct that violates Section 5(a) of FTC Act also violates Section 10-1-391 of the Georgia Fair Business Practices Act ("FBPA"). O.C.G.A. 10-1-391(b) ("It is the intent of the General Assembly that this part be interpreted and construed consistently with interpretations given by the Federal Trade Commission in the federal courts pursuant to Section 5(a)(1) of the

---

[57] The factors considered in ruling on a motion for a temporary restraining order "mirror" those considered on a motion for a preliminary injunction. 11 A Federal Practice & Procedure § 2951 (3d ed.); *see Schiavo ex rel. Schindler v. Schiavo,* 403 F.3d 1223, 1225 (11th Cir. 2005) (same).

Federal Trade Commission Act (15 U.S.C. § 45(a)(1)), as from time to time amended"). *See 1st Nationwide Collection Agency, Inc. v. Werner*, 288 Ga. App. 457, 459 (2007); *Gilmore v. Account Mgmt., Inc.*, 357 F. App'x 218, 220–21 (11th Cir. 2009).[58]

### a.    Defendants have violated Section 5 of the FTC Act.

A defendant is liable under Section 5 for making false or misleading representations if the defendant (1) made a representation (2) that was likely to mislead consumers acting reasonably under the circumstances and (3) the representation was material. *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003) (citations omitted).   As demonstrated below, Defendants made material misrepresentations that misled consumers, and thus, they have violated Section 5 of the FTC Act and the FBPA.

### 1. Defendants make representations that are likely to mislead consumers.

At the core of its business practices, LDR makes at least two representations to consumers: (1) that LDR pays consumers the Quote or an amount close to the Quote for their used electronic devices,[59] and (2) that during the Rejection Period

---

[58] Because, if the FTC demonstrates that Defendants have violated Section 5(a), it also demonstrates that Defendants violated the FBPA, the law cited in this Memorandum and analysis of the same will focus on the FTC Act.

[59] (App. 147-148, ¶ 5; App. 247-247, ¶ 5; App. 257, ¶ 4; App. 271-272, ¶ 5; App. 285, ¶ 3; App. 335, ¶ 6)

consumers will be allowed by the Company to request the rerun of their devices, and if they do so, LDR will return their devices to them.[60]

Each of these representations is likely to mislead consumers. Whether a representation is likely to mislead consumers is "evaluated from the perspective of the reasonable prospective purchaser, that is, a reasonable consumer in the audience targeted by the advertisement." *FTC v. Wash. Data Res.*, 856 F. Supp. 2d 1247, 1272 (M.D. Fla. 2012), *aff'd*, 704 F.3d 1323 (11th Cir. 2013). "Consumers need not be actually deceived, the representations need only have the tendency or capacity to deceive." *Tashman,* 318 F.3d at 1283 (Vinson, J., dissenting) (citing *Trans World Accounts, Inc. v. FTC,* 594 F.2d 212, 214 (9th Cir.1979)). "[W]hile customer reliance is not controlling, how consumers resolve ambiguities in representations made to them is highly probative of whether the representations have a tendency or capacity to deceive." *Tashman,* 318 F.3d at 1283 (Vinson, J., dissenting) (internal citations omitted). "The important criterion in determining the meaning of an advertisement is the net impression that it is likely to make on the general populace." *FTC v. EMA Nationwide, Inc.*, 767 F.3d 611, 631 (6th Cir. 2014) (internal citation omitted). Thus, "when assessing the meaning and representations conveyed by an advertisement, the court must look to the advertisement's overall,

---

[60] (App. 455, ¶ I; App. 479, ¶ I; App. 568, ¶ I)

14

net impression rather than the literal truth or falsity of the words in the advertisement." *See F.T.C. v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1189 (N.D. Ga. 2008), *aff'd*, 356 F. App'x 358 (11th Cir. 2009)

As shown below, LDR's representations 1) had the capacity or tendency to deceive consumers because they were false or lacked a reasonable basis, and 2) actually deceived consumers.

*First*, a representation is likely to mislead if it has the capacity or tendency to deceive; that is, it is either false or lacks a reasonable basis. *See FTC v. Pantron I Corp.*, 33 F.3d 1088, 1096 (9th Cir. 1994). LDR's advertisements, through its "price-quote engine" and/or through its representations that consumers will "[r]eceive the cash promised in your quote" or the "exact amount we quote", are false or lacked a reasonable basis.[61] The testimony of LDR's former employees evidences that LDR typically never pays the Quote or an amount close to the Quote for used devices. [62] Thus, LDR's representations are false or lack a reasonable basis.

Likewise, although LDR promises consumers that they will be allowed to request the return of their devices and have their devices returned to them,[63] LDR

---

[61] (App. 369, ¶8-App. 371, ¶9.; App. 908:15-909:18; App. 954:26-956:25; App. 1093:12-1094:13.)
[62] (*Id.*)
[63] (App. 455, ¶ I; App. 479, ¶ I; App. 568, ¶ I),=

15

makes it extremely difficult to request the return of the device by failing to answer their phones or hanging up on consumers.[64]

*Second*, although actual deception is unnecessary, evidence—like that presented here—that consumers are actually deceived is "highly probative to show that a practice is likely to mislead consumers...." *FTC v. Direct Benefits Grp., LLC*, No. 6:11-CV-1186-ORL-28TBS, 2013 WL 3771322, at \*15 (M.D. Fla. July 18, 2013) (citation and quotation marks omitted). Here, LDR deceived many consumers with its representations that consumers would receive the Quote or an amount close to the Quote,[65] and that they could request and receive their devices back within the Rejection Period.[66]

### 2. Defendants' Representations are Material.

Each of LDR's representations to consumers is also material. "A representation or omission is material if it is the kind usually relied on by a reasonably prudent person." *FTC v. Windward Mktg.*, No. 1:96–cv–615-FMH, 1997 U.S. Dist. LEXIS 17114, at \*27, 1997 WL 33642380, at \*9 (N.D. Ga. Sept. 30, 1997). A misleading impression is material if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct

---

[64] (App. 16, ¶ 12; App. 372, ¶ 12)

[65] (App. 147-148, ¶ 5; App. 247-247, ¶ 5; App. 257, ¶ 4; App. 271-272, ¶ 5; App. 285, ¶ 3; App. 335, ¶ 6)

[66] (App. 33, ¶ 9; App. 51, ¶ 6; App. 56-57, ¶ 8; App. 184, ¶ 10; App. 194, ¶¶ 10-11)

16

regarding, a product." *FTC v. Cyberspace.com, LLC,* 453 F.3d 1196, 1201 (9th Cir. 2006) (citation and quotes omitted). "Express claims, or deliberately-made implied claims, used to induce the purchase of a particular product or service are presumed to be material." *Windward Mktg.,* 1997 WL 33642380, at *10 (N.D. Ga. Sept. 30, 1997).

Defendants' representations are material for at least three reasons. *First,* Defendants make express or deliberately-made implied representations to induce consumers to use sell their electronic devices to LDR,[67] and this, like an implied claim to induce the purchase of a particular product or service, is presumptively material. *Id.*; *FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1272 (S.D. Fla. 1999) (citations omitted).[68]

*Second,* representations that go to "the heart of a consumer's decision to purchase" a product or service are presumptively material. *FTC v. USA Beverages, Inc.*, No. 05-61682, 2005 U.S. Dist. LEXIS 39075, at *17 (S.D. Fla. Dec. 5, 2005), *report and recommendation adopted*, No. 05-61682, 2005 U.S. Dist. LEXIS 39026 (S.D. Fla. Dec. 8, 2005). LDR's representations lured consumers into entering a

---

[67] (App. 374, ¶ 16)

[68] While the court's analysis in this area generally focuses on the purchase of a product or service, whereas here, when the purchase price is used to induce the consumer to *sell* a product, the analysis should not differ, as both go to the consumers' perceptions about the cost they will incur in the transaction.

17

monetary transaction they otherwise would not have agreed to enter.[69]   For example, consumer Leonard Cooper states "Had I known that I would be receiving only $15.00 from LDR for my device instead of the $194.00 stated in its original offer, I would not have sent it to LDR."[70]

### a.   Individual Liability of Kruchinin

An individual defendant is liable for corporate practices that violate Section 5 of the FTC Act, if the defendant (1) had "some knowledge of the practices" and (2) either "participated directly in the practices" or "had authority to control them." *FTC v. Gem Merch. Corp.,* 87 F.3d at 470. (citation and quotation marks omitted). Circumstantial evidence is sufficient to establish that a defendant had "requisite … knowledge" of a deceptive or fraudulent practice, *Wiand v. Wells Fargo Bank, N.A.*, 938 F. Supp. 2d 1238, 1244 (M.D. Fla. 2013), and a defendant's "degree of participation in business [affairs] is probative of knowledge," *FTC v. Transnet Wireless*, 506 F. Supp. 2d 1247, 1270 (S.D. Fla. 2007) (citation and quotation marks omitted).   In addition, even if there is no evidence that a defendant participated directly in a fraudulent practice, "[a]uthority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer." *FTC v. Amy Travel*

---

[69] (App. 149, ¶ 13; App. 179, ¶ 12; App. 204, ¶ 8; App. 225, ¶ 15)
[70] (App. 149, ¶ 13)

*Serv.*, 875 F.2d 564, 573 (7th Cir. 1989) (citations omitted); *see IAB Mktg. Assocs.*, 746 F.3d at 1233 (same). In fact a defendant's "status as a corporate officer gives rise to a presumption of ability to control a small, closely-held corporation." *Transnet Wireless*, 506 F. Supp. 2d at 1270 (citation and quotation marks omitted).

Kruchinin is the CEO, sole member, owner, and a member of LDR.[71] Further, Kruchinin was aware of consumer complaints that LDR deceived consumers with its representations as early as 2011.[72] Moreover, Kruchinin directly deposits Company profits into his individual bank account.[73]   Because Kruchinin knows about, participates directly in, and controls the scam, he is individually liable for the practices of LDR.

### 3.  A Temporary Restraining Order Is In The Public Interest.

A temporary restraining order prohibiting Defendants from continuing to perpetrate their "bait and switch" scam is in the public interest.  It is well established that the FTC's efforts to "protect the purchasing public against deceptive methods and misrepresentations by which purchasers are deceived . . . [are] in the public interest." *FTC v. Rhodes Pharmacal Co.*, 191 F.2d 744, 747 (7th Cir. 1951).  The "principal equity weighing in favor of" injunctive relief is thus "the public's interest in effective enforcement" of the FTC Act, which is "intended to safeguard . . .

---

[71] (App. 379, ¶ 6; App. 467-468)
[72] (App. 1202-1203)
[73] (App. 1167)

consumers." *Univ. Health*, 938 F.2d at 1225 (citation and quotation marks omitted). Indeed, as the Second Circuit has noted, the passage of a statute prohibiting conduct, like Section 5's prohibition of false and misleading representations, "is, in a sense, an implied finding that violations will harm the public and ought, if necessary, be restrained." *United States v. Diapulse Corp. of Am.*, 457 F.2d 25, 28 (2d Cir. 1972); *see* 11A Fed. Prac. & Proc. Civ. § 2948.4 (3d ed.) ("A federal statute prohibiting the threatened acts that are the subject matter of the litigation has been considered a strong factor in favor of granting a preliminary injunction."). Accordingly, where, as here, the FTC has demonstrated that it is likely to succeed on the merits,[74] defendants "face a difficult task in justifying the nonissuance of a preliminary injunction." *Univ. Health*, 938 F2d at 1225.

The public's interest in preventing Defendants from continuing to perpetrate their scam far outweighs any private interest Defendants may have in continuing to perpetrate it. Defendants "have no vested interest in a business activity found to be illegal." *Diapulse*, 457 F.2d at 29 (citation and quotation marks omitted).

Here, a temporary restraining order is in the public interest. As shown above, Plaintiffs are likely to prevail on the merits of their claims against LDR, and LDR has demonstrated that it will continue to operate its deceptive scam. The BBB

---

[74] (*see*, *supra*, at 12-19)

20

notified LDR more than five years ago that LDR was deceiving consumers with its representations, and that, as a result, consumers were injured.[75] In spite of this, and despite a court enjoining LDR from falsely advertising and engaging in deceptive practices in March 2015,[76] LDR has continued its operation, opening up new websites,[77] and continues to receive consumer complaints.[78]

In sum, Plaintiffs are likely to succeed on the merits of their claims that Defendants are violating the FTC Act and FBPA by making false and misleading statements to consumers as part of its bait and switch scam. Moreover, a temporary restraining order prohibiting Defendants from continuing to perpetrate their scheme is in the public interest. Accordingly, the Court should grant Plaintiffs' request for a temporary restraining order.

## B.   *An Asset Freeze is Necessary to Preserve Assets for Final Relief.*

This Court not only has power to issue a temporary restraining order, but also has the inherent power of a court of equity to grant ancillary relief, including freezing assets. *FTC v. Gem Merch. Corp.,* 87 F.3d at 469 ("[A] district court may order preliminary relief, including an asset freeze, that may be needed to make permanent relief possible."). "The FTC's burden of proof in the asset-freeze context

---

[75] (App. 1175, ¶ 23)
[76] (App. 1236:13-25)
[77] (App. 1183, ¶ 15)
[78] (App. 1185, ¶ 57)

is relatively light." *FTC v. IAB Mktg. Assocs.*, 746 F.3d at 1234. All that is necessary is a "reasonable approximation of a defendant's ill-gotten gains." *Id.* (citation and quotation marks omitted)

Here, the possibility of permanent relief—*i.e.*, consumer redress—will be jeopardized unless the Court issues the requested asset freeze. For at least part of this time, Defendants were making at least $1 million dollar a month,[79] and Defendants' partial bank account records show that they have taken in more than $20 million since 2014 alone.[80] Despite LDR's significant assets, Kruchinin has failed to observe corporate formalities, and in part has operated and deposited LDR's profits in a personal bank account.[81] Moreover, Defendants have paid more than $8 million dollars to an American Express card since 2014.[82] The possibility of a large monetary judgment depriving Defendants of the fruits of their illicit labor provides them with ample incentive to conceal or dissipate otherwise recoverable assets. Accordingly, the Court should grant Plaintiffs' request for an asset freeze.

## C. *A Temporary Receiver and Immediate Access is Necessary to Protect Assets and Evidence and to Maintain the Status Quo.*

In similar actions involving fraudulent conduct, courts have regularly exercised their equitable authority to appoint a temporary receiver over corporate

---

[79] (App. 965, ¶21- App. 966, ¶ 14)

[80] (App. 1165, ¶ 6)

[81] (App. 1167, ¶ 7)

[82] (App. 1166-1167, ¶ 7)

defendants and to grant plaintiffs immediate access to defendants' records.[83] Here, that fraud permeates Defendants' scheme[84] and that consumers have already sustained extensive injury warrants the appointment of a receiver and an immediate access.  Moreover, Defendants previously admitted that they did not comply with a subpoena *duces tecum* served on them by a state governmental agency, lessening the likelihood that they will preserve evidence in this action.[85] A temporary receiver will ensure that LDR does not engage in unlawful activity during the pendency of this action and does not destroy critical evidence about the scope of Defendants' fraud, thereby increasing the possibility that this Court will be able to provide effective final relief at the end of this action. Granting Plaintiffs' immediate access to documents and records will likewise shine light on the extent of Defendants' fraud and bolster the possibility of final effective relief.

---

[83] *See, e.g.*, *FTC v. D&S Marketing Solutions,* LLC, 8:16-cv-1435-MSS-UAM (M.D. Fla. June 18, 2016); *FTC v. National Payment Processing* LLC, 1:15-cv-03811-AT (N.D. Ga. Nov. 03, 2015); *FTC and State of Florida v. E.M. Systems & Services, LLC, et. al.*, 8:15-cv-01417-SDM-EAJ (M.D. Fla. June 17, 2015); *FTC v. Pinnacle Mktg.*, No. 1:13-cv-03455 (N.D. Ga. Oct. 21, 2013); *FTC v. Direct Connection Consulting, Inc.*, 1:08-cv-1739 (N.D. Ga. May 14, 2008); *FTC v. Prophet 3H, Inc.*, 1:06-cv-1692 (N.D. Ga. July 18, 2006); *FTC v. Info. Mgmt. Forum, Inc.*, No. 6:12-cv-986-GAP-KRS (M.D. Fla. June 28, 2012); *FTC v. VGC Corp.*, No. 1-11-cv-21757 (S.D. Fla. May 16, 2011); *FTC v. U.S. Mortgage Funding, Inc.*, No. 9:11-cv-80155-JIC (S.D. Fla. Feb. 9, 2011)

[84] (*see, supra*, pp. 6-8)

[85] (*See, supra*, p. 10, fn. 3)

Whereas, here, Defendants have shown no ability or inclination to abide by the law,[86] appointing a receiver is essential to ensure that LDR complies with the Court's Order and does not destroy evidence or dissipate assets. Indeed, "[t]o allow defendants to retake control of the corporate form would be tantamount to allowing the proverbial fox to guard the henhouse." *FTC v. USA Beverages, Inc.*, No. 05-61682 CIV, 2005 WL 5654219, at *8 (S.D. Fla. Dec. 6, 2005).

## D.   *An Ex Parte Order is Necessary Because the Defendants are Likely to Hide Assets and Destroy Evidence if Informed of this Action.*

This Court should issue an order *ex parte* where, as here, "providing notice to the defendant would render fruitless the further prosecution of the action." *AT&T Broadband v. Tech Commc'ns, Inc.*, 381 F.3d 1309, 1319-20 (11th Cir. 2004) (citation and quotation marks omitted).

A moving party can establish that an *ex parte* order is necessary with an attorney declaration that offers evidence that a defendant is likely to hide fraudulently obtained assets or destroy evidence if informed of an action. For instance, in *AT&T Broadband*, the Eleventh Circuit held that it was appropriate for a district court to issue an *ex parte* order where the moving party submitted an attorney affidavit "detailing numerous cases where defendants charged" with similar violations had "destroyed or transferred records, evidence, and assets." *Id.* at 1319.

---

[86] (*See*, *supra*, p. 11)

As demonstrated above,[87] and by the Attorney Declarations filed concurrently herewith, Defendants' conduct evinces a conscious effort to avoid law enforcement, and it is thus likely that Defendants will take additional steps to avoid liability— including hiding fraudulently obtained assets and evidence, if informed of this action. Accordingly, the Court should consider this motion, and provide the requested relief, on an *ex parte* basis.

## CONCLUSION

For all the reasons stated above, Plaintiffs respectfully request that the Court issue an *ex parte* temporary restraining order including an asset freeze, immediate access, appointment of a receiver, and order to show cause why a preliminary injunction should not issue.

Respectfully submitted,

DAVID C. SHONKA,
Acting General Counsel

ANNA M. BURNS
Ga. Bar No. 558234
HANS CLAUSEN
Ga. Bar No. 153250
Federal Trade Commission
Southeast Region
225 Peachtree Street, N.E., Suite 1500

---

[87] (*see, supra*, pp. 11-17)

Atlanta, GA 30303
Telephone: (404) 656-1350
Facsimile: (404) 656-1379
E-mail: aburns@ftc.gov; hclausen@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

SAMUEL S. OLENS
Attorney General
State of Georgia
Ga. Bar No. 551540
ANNE S. INFINGER
Deputy Attorney General
Ga. Bar No. 382918

KATHERINE D. SCHUESSLER
Ga. Bar No. 147108
Georgia Department of Law
Consumer Protection Unit
2 Martin Luther King, Jr. Drive, Suite 356
Atlanta, Georgia 30334
Phone: (404) 656-1761
Facsimile: (404) 651-9018
E-mail: kschuessler@law.ga.gov

Attorneys for Plaintiff
STATE OF GEORGIA

## LOCAL RULE 7.1(D) CERTIFICATION OF COMPLIANCE

Undersigned counsel certifies that **PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR *EX PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER, ASSET FREEZE, IMMEDIATE ACCESS, APPOINTMENT OF A RECEIVER, AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE** uses Times New Roman 14 pt. font in compliance with Local Rule 5.1(C).

ANNA M. BURNS
GA Bar No. 558234