# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **FEDERAL TRADE COMMISSION and STATE OF GEORGIA** | ) ) ) | |
| **Plaintiffs.** | ) ) | **Civil Action File No: 1:16-cv-3591-AT** |
| **v.** | ) ) | |
| **LAPTOP & DESKTOP REPAIR LLC, A Nevada Limited Liability Company, also d/b/a cashforiphones.com, cashforlaptops.com, ecyclebest.com, smartphonetraders.com, sell-your-cell.com; and VADIM OLEGOVICH KRUCHININ, also a/k/a Vadim Kruchinin, David Kruchinin, David Vadim Kruchinin, Dave Kruch, as the owner and an officer of Defendant Laptop & Desktop Repair, LLC,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| **Defendants** | | |

## RECEIVER'S FIRST REPORT

NOW COMES Hays Financial Consulting LLC and S. Gregory Hays, the duly authorized and acting Receiver herein (the "Receiver") by and through its undersigned counsel and makes and files the Receiver's First Report to the Court and states as follows:

## INTRODUCTION

On September 26, 2016, this Court entered its "*Ex Parte* Temporary Restraining Order With an Asset Freeze and Other Equitable Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue" (the "TRO"). Among other things, the TRO provided for the appointment of the Receiver and set forth the Receiver's duties and obligations.   The Receiver was appointed as the Receiver for Defendant Laptop & Desktop Repair, LLC that is defined in the TRO as the "Receivership Defendant".  Among the duties assigned to the Receiver was the requirement, set forth in Section XVI of the TRO, that the Receiver file a Report with the Court on or before the date set for hearing to Show Cause regarding the Preliminary Injunction regarding the following:

(1)    the steps taken by the Receiver to implement the terms of this Order;

(2)    the value of all liquidated and unliquidated assets of the Receivership Defendant;

(3)    the sum of all liabilities of the Receivership Defendant;

(4)    the steps the Receiver intends to take in the future to (a) prevent any diminution in the value of the assets of the Receivership Defendant, (b) pursue receivership assets from third parties, and (c) adjust the liabilities of the Receivership Defendant, if appropriate;

(5)     whether the business of the Receivership Defendant can be operated

lawfully and profitably; and

(6)     any other matters which the Receiver believes should be brought to

the attention of the Court.


**REPORT**

I.      **Steps Taken by the Receiver to Implement the terms of the**
        **TRO**.

        A.      **Appointment and Initial Preparation**

1.      The Receiver was advised of the TRO and the appointment of the

Receiver by the FTC on September 26, 2016.  The FTC provided the Receiver with

a copy of the TRO.  The Receiver was advised that the filing of the lawsuit and

TRO were under seal and that the FTC had made arrangements with law

enforcement officials to enter the premises of the Receivership Defendant on

Thursday, September 29, 2016.  The FTC advised the Receiver that the Receiver

should plan on entering the business premises of the Receivership Defendant in

Sparks, Nevada at that time.

2.      The Receiver noted that the TRO required the Receiver to post a

bond.  The Receiver procured a bond in accordance with the TRO which is

attached as Exhibit "A".

3.      Immediately after the appointment, the Receiver designated S. Gregory Hays and Scott Askue to work on the engagement and to travel to Sparks, Nevada to enter the business premises on September 29.  Messrs. Hays and Askue reviewed the TRO and voluminous other pleadings and documents to prepare for the engagement and made arrangements to travel to Sparks.

4.      The Receiver also retained Henry F. Sewell, Jr. of the Law Offices of Henry F. Sewell, Jr. LLC to serve as his counsel in this matter.  Mr. Sewell also began to review documents and materials related to the matter and made arrangements to travel to Sparks.

5.      Prior to the filing of this lawsuit, the Receiver provided a written proposal to the FTC to serve as Receiver in this case.  This will confirm that the Receiver will staff this matter in accordance with that proposal and that the hourly rates charged by the Receiver herein will be in accordance with that proposal.

6.      Prior to travelling to Sparks, the Receiver and his counsel conferred with the FTC.  The FTC provided the Receiver with information about the case and further advised the Receiver of the specific steps they had already taken to gain access to the business premises.  The Receiver was given a list of contacts and was instructed to meet with the FTC at the offices of the Sparks Police Department at 7:30 am on September 29.   The Receiver was advised that the Sparks Police

Department would accompany the Receiver and the FTC to the business premises of the Receivership Defendant.

7.      The Receiver was further advised that the FTC had already identified several financial institutions at which the Receivership Defendant had (or might have) bank accounts and that the FTC intended to notify these banks of the TRO on the morning of September 29 at about the same time as the planned entry of the business premises of the Receivership Defendant.

8.      The Receiver was also advised that the FTC had assembled a computer forensic team to immediately begin copying the Receivership Defendant's computer files.  For this reason, the Receiver did not employ his own computer forensic to copy electronic data.

### B.      Entry of the Business Premises

9.      On September 29, Messrs. Hays, Askue and Sewell accompanied the FTC to the offices of the Receivership Defendant, located at 84 Coney Island Drive, Sparks, Nevada.   Several officers and detectives of the Sparks Police Department made the initial entry into the offices of the Receivership Defendant. All of the employees then working immediately ceased their activities, were instructed to step away from their computers and desks and were collected at the front of the building.  A process server employed by the FTC served a copy of the

TRO upon Vadim "David" Kruchinin upon entering the premises.  Mr. Kruchinin is a named defendant in this case and the owner of the Receivership Defendant.

    10.    Following entry into the premises, the Receiver undertook the following tasks:

    A. Gregory Hays met with Mr. Kruchinin to solicit his cooperation, make sure he understood the terms of the asset freeze and TRO and to obtain basic facts about the activities of the Receivership Defendant;

    B. The employees were each given a questionnaire to complete, the form of which is attached hereto as <u>Exhibit "B"</u>;

    C. The Receiver team conducted a physical inspection of the business premises of the Receivership Defendant;

    D. The Receiver met with the employees of the Receivership Defendant to explain what was happening and to request their cooperation and assistance;

    E. The Receiver collected all keys and swipe cards, obtained alarm codes and arranged for a locksmith to change all of the locks; and

    F. The Receiver began seeking out critical documents and information particularly information regarding bank accounts and assets.  The Receiver did not take immediate control of the

Receivership Defendant's computer systems since the FTC immediately began to copy all hard drives and data.

11.     With very few exceptions, the employees of the Receivership Defendant remained calm and fully cooperated with the Receiver.  Each employee requested to fill out a form did so.  After the forms were filled out, each employee was interviewed by a member of the Receiver team. Approximately 45 employees were working at the Receivership Defendant on the morning of September 29 and each was interviewed.  The impression of the members of the Receiver team was that many of the employees were not surprised by the actions taken by the FTC.  The vast majority of these employees were sent home within two hours of the Receiver entering the building and were permitted to take any of their personal possessions.  No employee was permitted to remove any papers or documents from their desks and no destruction of documents or data was witnessed by either the members of the Receiver team or the FTC.

12.     Members of the Sparks Police Department remained on site for the entire day to make sure that the premises was secured and to ensure that no one entered or exited the premises without the consent of the Receiver.

13.     Approximately two hours after first arriving at the facility, corporate counsel for the Receivership Defendant appeared and asked to review the TRO and

other pleadings.  This attorney then reviewed the TRO and met separately with Mr. Kruchinin and other senior managers of the Receivership Defendant.   Counsel for the Receiver then met with counsel for the Receivership Defendant to further discuss the TRO and the status of the case.

14.   During the initial interviews with employees, managers and counsel, the Receiver attempted to obtain the following information:

A. The status of the Receivership Defendant's business operations and the role of each employee;

B. The identity of bank accounts used by the Receivership Defendant or its affiliates;

C. The identity and location of assets owned by the Receivership Defendant;

D. All entrances and exits to the business premises to ensure that the business premises and records were secured;

E. The identify of liabilities or obligations of the Receivership Defendant;

F. Whether the Receivership Defendant was still engaged in the sales practices which served as the bases of the FTC's complaint in this case; and

G. Any immediate business issues requiring the attention of the Receiver.

### C.        Initial Findings

15.    The scope and size of the Receivership Defendant's business operations were significant.   The Receivership Defendant operates its business from offices and a warehouse contained in a single building.    The offices and warehouse are almost completely filled with documents, inventory and other equipment.   Pictures taken by the Receiver are attached as Exhibit "C" to this Report.

16.    As noted below, the Receiver in informed that a definitive inventory report exists for the Receivership Defendant but the Receiver has not yet been able to locate a copy of it.   However, a visual inspection of the premises indicates that the Receivership Defendant has at least several hundred, if not thousands, of smartphones on site as well as thousands of parts of laptops, which it has listed for sale.   There are also numerous phones and laptops in various states of assembly and repair.   The Receiver was advised that the Receivership Defendant sold between 150 and 250 smartphones per day in addition to a substantial amount of laptop parts.

17.    The Receiver was able to confirm many of the allegations in the FTC Complaint, including that the Receivership Defendant's business consists of the

purchase and resale of smartphones and laptop equipment.   With respect to smartphones, the Receivership Defendant purchases the smartphones both from consumers and from wholesalers.   With respect to purchases from consumers ("Consumer Purchases"), the Receivership Defendant inspects each phone it receives and often refurbishes or repairs these phones before re-selling them.  With respect to wholesale purchases ("Wholesale Purchase"), the Receivership Defendant purchases already refurbished phones from wholesalers located both in the United State and in China and then re-sells these phones, often on EBay or Amazon.   Generally speaking, the smartphones acquired from Wholesale Purchases do not require refurbishing or repair and are listed for sale as soon as (or even before) they are received by the Receivership Defendant.   The Receivership Defendant sells virtually all of its inventory through EBay, Amazon or other internet sites.

18.    With respect to laptops, the Receivership Defendant acquires laptops, primarily from consumers, which it then disassembles for re-sale of parts (the "Laptop Business").  The Receivership Defendant does not sell entire laptops and its Laptop Business consists entirely of the sale of laptop parts.   The Receivership Defendant dedicated a significant portion of its warehouse to the disassembly of laptops and storage of laptop parts for re-sale.

19.    The Complaint filed by the FTC alleges that the Receivership Defendant engaged in deceptive trade practices with respect to the acquisition of both smartphone and laptops from consumers.  The Complaint essentially alleges that the Receivership Defendant engaged in a classic "bait and switch" with respect to the acquisition of smartphones and laptops from consumers, i.e, the Receivership Defendant would advertise high acquisition prices and then pay a much lower price after receiving the phone while ignoring or rejecting attempts by consumers to get their equipment back or to obtain higher prices when they learned of the lower price actually paid.

20.    During the course of employee interviews, it appeared to the Receiver that there was widespread knowledge of this practice by the Receivership Defendant.  Several employees claimed that they were told that the low prices were designed to encourage consumers to make counter-offers.   Others stated that they had been told that the Receivership Defendant would cease Consumer Purchases and would instead acquire inventory solely through Wholesale Purchases.  Finally, there were employees who refused to work in consumer relations because of these practices and limited their work to either technical support or the sale of equipment to third parties on EBay and other websites.   Many employees were aware of news reports regarding the activities of the Receivership Defendant and had viewed a national TV news story about the company.

21.     During initial employee interviews, both rank and file employees and Mr. Kruchinin advised the Receiver that the business was in the process of changing its business model to stop Consumer Purchases and to focus solely on acquiring smartphones from wholesalers for resale.  The Receiver's impression is that the Receivership Defendant, its management and employees knew that the Consumer Purchases could not continue and that it had to find a new business model in order to continue in business.

22.     The majority of the employees of the Receivership Defendant were very cooperative and turned over all information requested by the Receiver and spoke freely with the Receiver regarding their impressions of the Receivership Defendant and its management.  Many of these employees had worked for the Receivership Defendant for several years.  As noted above, several employees openly commented that they had expected something like this to happen.   The Receiver was also advised that the employees were two weeks in arrears on payroll and that the next payroll was scheduled for October 3, 2016.

23.     In particular, the financial manager for the Receivership Defendant was very cooperative and printed copies of balance sheets, profit and loss statements, current payroll registers, select vendor registers and accounts receivable and payable.  However, this person also told the Receiver that she relied entirely upon information received from the senior management, particularly Mr.

Kruchinin in preparing this information.    The Receiver was advised that this information had never been audited by an outside accounting firm.

24.    There were, however, three critical pieces of information which the Receiver sought to obtain but which it was unable to obtain.  The Receiver believes it will ultimately be able to obtain this information through direct access to the Receivership Defendant's computer systems and further investigation.

25.    First, and most critically, the Receiver wanted an accurate inventory of all equipment on the business premises.    The Receiver was advised by employees that each time a smartphone or laptop was received, it was placed in a bag and assigned a unique identifying number.    These employees advised the Receiver that a bar code reader could be used to easily obtain information about each product.  It did appear to the Receiver that the Receivership Defendant kept accurate and detailed records of its inventory.  However, only two employees had access to the complete inventory report.  The first was Timothy Bean, who was generally in charge of the Receivership Defendant's computers.    He was apparently the only employee who could generate inventory reports from the Defendant's computer system.  Although Mr. Bean was initially cooperative and agreed to print out this report, he asked that he be excused from the offices to pick up his child.    At the time he asked to be excused his computer had been disassembled by the FTC and was being copied.  He promised to return later in the

day to print out the report after he picked up his child and after the FTC finished copying his computer. Mr. Bean then failed to return to the office and the Receiver is in the process of seeking to obtain his cooperation. As noted below, the Receiver has been given a balance sheet which contains a value for the inventory but still requires a detailed report. Similarly, Defendant Kruchinin refused to produce these reports although he estimated that the liquidation value of the inventory in the warehouse was $250,000.

26.     Second, the Receiver sought information as to who was responsible for the setting of the prices for the purchase of equipment from consumers. The lower level employees informed the Receiver that prices were established automatically by a software program designed by Mr. Bean. One employee stated that he thought that the prices were too low, but was told by management that the low prices were designed to encourage consumers to negotiate with the Receivership Defendant. These employees asserted they had no discretion in the setting of these prices. Mr. Bean acknowledged setting up the program but stated that prices were set by Mr. Kruchinin. Mr. Kruchinin denied setting the prices and claimed that the prices were set by lower level employees, a claim which did not seem credible to the Receiver. The Receiver continues to investigate this issue, but, as of the filing of this Report, no employee has accepted responsibility for setting the prices which served as the basis of the "bait and switch" program. The

Receiver did learn that bonuses to the purchasing department employees were based partially on the acquisition prices.

27.    Third, the Receiver requested that Mr. Kruchinin provide log ins and passwords for his computer accounts.   Mr. Kruchinin claimed he could not remember his password and claimed it was written on a piece of paper in his office which he was unable to locate.   The Receiver did not find Mr. Kruchinin's claims with respect to his password to be credible and will further address this issue and issues related to Mr. Kruchinin below.

### D.    Business Issues

28.    After counsel for the Receivership Defendant reviewed the TRO and consulted with his client, he requested a meeting with counsel for the Receiver. Counsel for the Receivership Defendant made two requests upon the Receiver. First, the Receivership Defendant expressed concerns that the Receivership Defendant had several hundred phones listed for sale on EBay.  The concern was expressed that orders were being processed for sale with consumers making payments at the time of purchase and that the orders would not be processed.    The Receivership Defendant requested that all pending offers be removed from the internet.  The Receiver agreed with this request and authorized an employee of the Receivership Defendant (under the supervision of an FTC computer expert) to remove all phones listed for sale on eBay and Amazon.

29.    Second, the Receivership Defendant advised the Receiver that approximately seven hundred (700) orders had been processed from Receivership Defendant through EBay but that the items ordered had yet been shipped by the Receivership Defendant.  Some of these orders were boxed and ready to be shipped while others had not yet been prepared for shipment.  The Receivership Defendant requested permission to ship these phones.

30.    The Receiver denied this request for two reasons.  First, the Receiver was advised that it would take as many as five employees a full day to complete these shipments and would cost several thousand dollars in shipping charges. Since the Receiver is still in the process of collecting the Receivership Defendant's cash, the Receiver did not want to incur this liability until it was sure that sufficient unencumbered funds existed to pay these costs.   Second, the Receiver also determined that several liens existed against the inventory and that it would be required to consult with these lenders before authorizing any shipping of this equipment.  The Receiver does believe that these transactions should be completed when sufficient funds are available to complete them and when the Receiver has the consent of the Receivership Defendant's lenders to complete these transactions.

II.    **Value of Receivership Assets**.

31.    Immediately upon his arrival on the premises, the Receiver began the process of securing all assets on the premises and attempting to determine the

value of those assets.  In particular, the Receiver requested copies of accounting information, balance sheets, inventories, accounts receivable and bank accounts from employees.

32.    As noted above, the financial manager of the Receivership Defendant cooperated with the Receiver and provided the Receiver with a balance sheet for the Receivership Defendant which is attached as Exhibit "D".  The balance sheet indicates total assets of approximately $2.2 Million.  However, the inventory balance reflected on the balance sheet has not been adjusted to reflect monthly sales.  The Receiver is advised that this adjustment is typically made at month's end.  As noted above, the numbers contained in the balance sheet have not been audited and are based entirely on information provided by Mr. Kruchinin and Mr. Bean.

33.    The balance sheet states that the Receivership Defendant has $93,091.56 of cash in checking accounts, pending Amazon sales and in PayPal accounts (the "Bank Accounts"). However, it is the understanding of the Receiver that the Bank Accounts were reconciled to the actual bank account balance two days in arrears and may not reflect the most current cash balance.  The cash available in bank accounts identified by the Receiver and for which it has determined the balance is only $65,529.38.

34.     The Receiver has now determined that Defendant Kruchinin arranged to transfer $22,000 from Pay Pal accounts to an entity known as Happy Smile LLC.  The information available to the Receiver indicates that this transfer took place after the TRO was served upon Mr. Kruchinin.   The Receiver is informed that Happy Smile LLC is controlled by a woman with whom Mr. Kruchinin is alleged to be romantically involved. The address on record with the Nevada Secretary of State for the registered agent and officer of Happy Smile LLC is Mr. Kruchinin's home address.  The Receiver is currently investigating these transfers and has made a demand for the return of these funds.  The Receiver intends to bring a contempt motion with this Court, if necessary, to recover these amounts.

35.     With respect to inventory, the Receiver has not confirmed the stated value of the inventory on the balance sheet which is $1,471,914.10.   As noted above, the Receiver has been informed that this was a value given to the company bookkeeper by senior management and not verified by her or by an auditor and does not reflect reductions due to sales during the month of September.  Moreover, the Receiver has learned that inventory may have been shipped to other addresses and not included in these calculations.  The Receiver is investigating the current whereabouts of this inventory.

36.     With respect to the inventory, there are several categories of inventory stored at the Receivership Defendant's business premises.  First, the Receivership

Defendant has segregated phones and laptops received from consumers which have not yet been processed or paid for by the Receivership Defendant.  This inventory is stored in a separate cage in the warehouse and it appears that each item has been placed in a plastic bag and logged into the Receivership Defendant's inventory accounting system (the "Unboxed Consumer Equipment").  The Receiver believes that this inventory is covered by Section XI of the TRO and that the Receiver is obligated to return this inventory to the affected consumers.  The Receiver is in the process of attempting to determine the cost of returning this equipment as well as consulting with financial institutions asserting liens against inventory to determine whether any competing liens are asserted.

37.    Second, the Receivership Defendant has also received a large number of packages which have not been opened. These unopened packages fit within two categories. The first category consists of smartphones and laptops sent to the Receivership Defendant as part of Consumer Purchases (the "Boxed Consumer Equipment").  An example of the Boxed Consumer Equipment is at first page of Exhibit "C".  The Receiver is advised that the Receivership Defendant has not paid for these items and that these consumers are expecting to receive a price quote from the Receivership Defendant for them. For these reasons, the Receiver believes that the Boxed Consumer Equipment are likely included within the scope of Section XI of the TRO and the Receiver is authorized to return these items to

the consumers who sent them.  The Receiver has been advised that at least some of Boxed Consumer Equipment can still be refused by the Receivership Defendant and returned to the sender of the package without incurring additional expense. Given that many of these packages are from consumers seeking to sell their smartphones or laptops, the Receiver intends to refuse delivery for as many shipments as possible so that the Boxed Consumer Equipment is returned to as many consumers as possible.  The Receiver is also consulting with any lienholders to determine whether they assert any liens against the Boxed Consumer Equipment.

38.     In addition to the unopened packages received from consumers, the there are also numerous unopened boxes at the warehouse which have an "RMA" number listed on the front.  This number indicates that it is a return of a product purchased from the Receivership Defendant (the "Boxed RMA Equipment").  The Boxed RMA Equipment are items paid for by consumers but which have been returned for various reasons (wrong item, wrong color, not working).  Since these items have been paid for by consumers, the Receiver also intends to reject as many of the Boxed RMA Equipment shipments as possible.   The Receiver is also consulting with any lienholders to determine whether they assert any liens against the Boxed Consumer Equipment.

39.    The remaining inventory consists of thousands of smartphones and laptop parts stored in the Receivership Defendant's warehouse which has been acquired from both consumers and wholesalers.  The Receiver believes and is informed that the inventory received from consumers has been paid for by the Receivership Defendant, albeit through alleged deceptive trade practices. However, with respect to inventory purchased from wholesalers, the Receiver located invoices in Mr. Kruchinin's office which indicated due dates in October and the Receiver believes that over $120,000 of the inventory has not yet been paid for and that this inventory may be subject to reclamation claims.

40.    The Receiver was advised by management and employees that the smartphones generally sold very quickly once they were listed for sale by the Receivership Defendant.  However, the Receiver was advised that the laptop parts generally sell very slowly.  The Receiver has not yet made a determination of the relative values of the smartphones and laptop parts in the Receivership Defendant's inventory.

41.    Until such time as the Receiver receives a complete inventory report, the Receiver cannot make a determination as to the value of the inventory.

42.    Because most of the Receivership Defendant's sales are paid for by consumers before shipment, the amount of accounts receivable is limited.

43.    The building in which the Defendant operates its business is owned by Coney Island 84 LLC, an entity which is believed to be under the control of Mr. Kruchinin.   The Receiver is currently investigating to determine whether this building, which is encumbered by several mortgages, can or should be brought into the Receivership Estate.

44.    The Receiver has contacted several law firms representing the Receivership Defendant to determine whether they are holding any retainers provided by the Receivership Defendant.  To date, these attorneys have agreed to cooperate with the Receiver and to account for retainers received by them.

45.    The Receiver also continues to investigate other assets listed in the balance sheet including the value of furniture fixtures, equipment, pre-paid expenses, and notes and loans payable to the Receivership Defendant

III.    **Liabilities of the Receivership Defendant**.

46.    The Receivership Defendant has substantial secured and unsecured liabilities.  Although the balance sheet attached as Exhibit "D" indicates that the Receivership Defendant is solvent on a balance sheet basis, the Receiver has not been able to make a final determination as to solvency and it is likely that the Receivership Defendant is insolvent on balance sheet basis.

47.    The Receivership Defendant has pledged its inventory to support three separate loans.  The Receiver does not have the precise outstanding balances of

these loans, but is advised that they total approximately $900,000.  The Receiver has determined that each of these lenders has filed financing statements, but the Receiver has not yet finally determined the validity and extent of these liens.

48.     In addition to secured debts, the balance sheet reflects $234,200.78 in "Wholesale Lot Inventory Payable" for the purchase of equipment from wholesalers which have apparently not been paid and other trade payables of $12,364.15.   In addition, the Receiver has located several invoices related to Wholesale Purchases which do not appear to have been paid for or shipped to the Defendant and may or may not be reflected in the Wholesale Lot Inventory Payable.

49.     The balance sheet reflects eight credit card accounts with balances totaling $572,022.97 with one credit card having a stated balance of $375,000. The Receiver is in the process of confirming these balances as well as any additional charges or accruing interest due for these accounts.

50.     At the time of the appointment of the Receiver, the Receivership Defendant was in the processing payroll for payments to be made on October 3, 2016.  Gross wages owed are $53,985.46 plus the employer related expenses of $6,796.02 for a total of $60,781.48. As noted above, the funds currently available would barely be sufficient to cover this liability.  The Receiver is investigating

whether this most recent payroll can be paid, but, at present, it appears this amount cannot be paid.

51.     The Receiver reviewed the employment files of the employees of the Receivership Defendant.  Based on this review, the Receiver determined that each employee executed an agreement at the time he/she became an employee.  This agreement provided that the employment relationship between the Receivership Defendant and each employee was an "at will" relationship which could be terminated at any time by either the employer or the employee.  Because the company does not have sufficient funds to pay its employees, the Receiver intends to proceed to formally terminate all of the employees as of September 29, 2016 so that they can seek unemployment compensation and other benefits and also to cut off any further exposure to the Receivership Estate.   Even though the Receiver may seek to employ several former employees on a temporary basis, the Receiver believes that it is appropriate to terminate the employees to avoid incurring any further liability for unpaid wages.

52.     Finally, it is likely that the Receivership Defendant has significant liability for improper trade practices in the acquisition of phones from consumers. This amount has not yet been liquidated, but given the numbers of phones and equipment involved, this liability, which is not reflected in the balance sheet, could be substantial.

IV.    Receiver's Next Steps.

53.    First and foremost, the Receiver intends to continue to investigate Mr. Kruchinin's apparent violations of the TRO and to seek the return of any improper transfers.  It is clear to the Receiver that Mr. Kruchinin has blatantly disregarded the TRO.

54.    Second, the Receiver also intends to seek a complete accounting of the inventory currently on the Receivership Defendant's premises and, based on this, will make specific recommendations regarding the disposition of the inventory.    In the interim, the Receiver has stopped accepting packages from consumers so that these packages are returned to their senders.

55.    Third, the Receiver is in the process of reaching out to the Receivership Defendant's secured lenders with respect to the disposition of the Unboxed Consumer Equipment, Boxed Consumer Equipment, Boxed RMA Equipment and the inventory generally.  The Receiver would like to engage in an orderly disposition of this inventory, but cannot do so until the extent and validity of liens against the inventory are addressed.  The Receiver does believe that the Unboxed Consumer Equipment, Boxed Consumer Equipment, and Boxed RMA Equipment should be returned to the consumers who sent them; however, this determination may be disputed by secured creditors holding liens against the inventory of the Receivership Defendant.

56.    Fourth, the Receiver would like to retain several of the former employees of the Receivership Defendant to assist in the disposition of the Receivership Defendant's inventory.  The Receiver believes that it would be very helpful to the Receivership to have several former employees assist it in organizing and identifying the inventory.  In addition, there is a significant amount of clean up work and organization work required to make the inventory available for a sale. Again, however, the Receiver cannot retain any former employees until it determines whether sufficient assets exist to pay these employees and whether it can use the proceeds of inventory to pay for their services.  The Receiver intends to discuss this issue with the Receivership Defendant's lenders.

57.    Fifth, the Receiver believes that the approximately 700 phones, tablets and laptop parts which have been purchased by consumers but not yet shipped should be shipped to the customers who have already paid for them.  The Receiver believes, but has not confirmed, that at least a portion of the funds in the Receivership Estate represent the proceeds of this sale.  The Receiver cannot complete this process, however, until the Receiver can confirm that there are sufficient available funds to pay the labor and shipping charges and ensure that there are no liens asserted against these items.

58.    Sixth, the Receiver has contacted several auction firms to determine the viability of conducing an auction of the assets of the Receivership Defendant.

59.     Seventh, depending upon the results of negotiations with the Receivership Defendant's lenders, the Receiver will file a plan for the disposition of the inventory and equipment.

60.     Finally, the Receiver will continue its administration of this case with the goal of paying creditors and making some restitution to consumers.  However, at this point, it is too early for the Receiver to make any predictions as to the results of this case.

V.     **Receiver's Recommendations Regarding Lawful Operation of the Business**.

61.     As noted above, many of the employees of the Receivership Defendant advised the Receiver that Receivership Defendant was in the process of changing its business model to exit the acquisition of equipment from consumers. The Receiver believes that there is no dispute that the Receivership Defendant cannot operate a business premised upon acquiring equipment at unfair prices from consumers.  Indeed, many of the employees had reservations about the purchases of inventory from consumers and seemed to believe that the transition to Warehouse Purchases would solve this problem.

62.     During a meeting with David Kruchinin, he set forth a plan for the Receivership Defendant pursuant to which it would cease buying any inventory from consumers and would instead focus on the purchase of equipment solely from wholesalers in commercial transactions.  Pursuant to this plan, the Receivership

Defendant would reduce its workforce from approximately 45 to less than 10.  The Receiver believes that this plan would also result in the Receivership Defendant exiting the business of disassembling laptops and exiting this business.   This plan had clearly been discussed within the company since it was discussed by several employees, but it is clear that Mr. Kruchinin had not mentioned to his employees that this plan would result in the reduction of as many as 30 employees.

63.    However, the Receiver does not believe, based on the information currently available to it, that this so called "Warehouse Plan" is viable for several reasons.  First, this plan would require the Receivership to acquire inventory at a much higher price resulting in tighter profit margins.  At present, the Receivership Defendant has no working capital and was relying on both a "float" from the Wholesale Purchases and a recent $200,000 loan to pay operating expenses. Indeed, had the TRO not been filed, the Receivership Defendant would have barely been able to make payroll.

64.    In addition, Mr. Kruchinin presented a summary of the "Warehouse Plan" to the Receiver which estimated a gross profit of $60 per phone. However, the Receiver located a spreadsheet in the Receivership Defendant's records which showed an average gross profit of $26 per wholesale phone, indicating that Mr. Kruchinin was exaggerating the estimated profitability of this business.

65.     Further, the impression of the Receiver was that this company was in a "death spiral" at the time he took control.  The Profit and Loss Statements show significant losses during 2016 and the balance sheet shows significant outstanding accounts payable for the wholesale inventory purchases, credit card debt and bank loans.  Although, the Receiver has not yet determined the accuracy of this data, the Receiver must assume that the Receivership Defendant was losing money at the time of his appointment.

66.     The Receiver's impression, based upon all of his investigation to date, is the business model of the Receivership Defendant only works if it is premised upon the acquisition of equipment at unconscionably low prices from consumers. That is not a lawful business model.

67.     The purported "Wholesale Plan" also ignores two significant issues which the Receivership Defendant and Mr. Kruchinin would have to address if they wanted to continue in business.

68.     First, the information currently available to the Receiver is that the Receivership Defendant generated significant profits several years ago when it was acquiring large amounts of equipment at extremely low prices from consumers.  At present, the Receiver has no information as to where these profits went and the extent to which Mr. Kruchinin has enriched himself at the expense of consumers. Mr. Kruchinin acknowledged that he had earned significant profits from the

business but claimed that he had reinvested these profits in recent years.   The Receiver is currently investigating this assertion.  As noted above, Mr. Kruchinin has not been cooperative with the Receiver and there is no reason to give these claims any credibility without a detailed accounting and disclosure by Mr. Kruchinin.   The Receiver does not believe there is any basis to permit the Receivership Defendant to continue in business without full disclosure and tracing of these profits.

69.   Second, the "Wholesale Plan" does not contemplate any compensation to the victims of the Receivership Defendant's prior misconduct. The Receiver does not believe the Receivership Defendant should pursue any business model which cannot compensate prior victims.

70.   It is clear to the Receiver that the Receivership Defendant cannot lawfully operate a business which is premised on the acquisition of equipment from consumers.  The fact that Mr. Kruchinin so quickly proposed a business model premised solely on acquisition of products from commercial sources demonstrates his knowledge of this.  Many of the employees were also aware of the need to exit the business of buying inventory from consumers.

71.   The Receiver is advised and informed that other companies are in the business of buying smartphones and computer equipment from commercial re-sellers on a wholesale basis and selling such equipment on a retail basis to

consumers through eBay and other internet sites.  Such a business is clearly lawful, but also must be carefully managed given the tight margins involved in this business.

72.    The only possible, lawful business model for the Receivership Defendant going forward would be the "Warehouse Plan" outlined by Mr. Kruchinin.   However, because of (i) the very tight margins involved in the "Warehouse Plan"; (ii) the Receivership Defendant's existing, significant debt burdens which would have be serviced; (iii) the lack of transparency regarding past business dealings, (iv) Mr. Kruchinin's failure to cooperate with the Receiver and to obey the TRO and (v) the inability of the Receivership Defendant to compensate consumers for past harm, the Receiver has determined that the Receivership Defendant should be liquidated and further business operations terminated.

## VI.    **Other Matters**.

73.    The Receiver believes that it has fully addressed the issues identified in the TRO to the best of its ability given the limited time available to do so. However, the Receiver must note for the Court that this case will likely require significant time and expense on the part of the Receiver.  The Receiver is not currently in a position to make any projections or estimates regarding recoveries to creditors or consumers in this case and will file further reports with the Court as

information and facts are developed.

Respectfully submitted, this 5th day of October, 2016.

                        LAW OFFICES OF HENRY F. SEWELL JR.,
                        LLC

                        */s/ Henry F. Sewell, Jr.*
                        Henry F. Sewell, Jr.
                        Georgia Bar No. 636265
                        Counsel for the Receiver

Law Offices of Henry F. Sewell, Jr.
Suite 200, 3343 Peachtree Road NE
Atlanta, GA 30326
(404) 926-0053
hsewell@sewellfirm.com

## CERTIFICATE OF COMPLIANCE

This is to certify that to the best of my knowledge this document has been prepared with one of the font and point selections approved by the Court in LR 5.1B, pursuant to LR 7. Specifically, the above-mentioned document has been prepared using Times New Roman font, 14 point.

This the 5th day of October, 2016.

LAW OFFICES OF HENRY F. SEWELL JR., LLC

*/s/ Henry F. Sewell, Jr.*
Henry F. Sewell, Jr.
Georgia Bar No. 636265
Counsel for the Receiver

Law Offices of Henry F. Sewell, Jr.
Suite 200, 3343 Peachtree Road NE
Atlanta, GA 30326
(404) 926-0053
hsewell@sewellfirm.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **FEDERAL TRADE COMMISSION** | ) | |
| **and STATE OF GEORGIA** | ) | |
| | ) | |
| **Plaintiffs.** | ) | **Civil Action File No:** |
| | ) | **1:16-cv-3591-AT** |
| **v.** | ) | |
| | ) | |
| **LAPTOP & DESKTOP REPAIR** | ) | |
| **LLC,** | ) | |
| **A Nevada Limited Liability** | ) | |
| **Company, also** | ) | |
| **d/b/a cashforiphones.com,** | ) | |
| **cashforlaptops.com, ecyclebest.com,** | ) | |
| **smartphonetraders.com, sell-your-** | ) | |
| **cell.com; and VADIM OLEGOVICH** | ) | |
| **KRUCHININ, also a/k/a Vadim** | ) | |
| **Kruchinin, David Kruchinin, David** | ) | |
| **Vadim Kruchinin, Dave Kruch, as the** | ) | |
| **owner and an officer of Defendant** | ) | |
| **Laptop & Desktop Repair, LLC,** | ) | |

**Defendants**

## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2016, I electronically filed the foregoing

Receiver's First Report with the Clerk of the Court using *CM/ECF*. I also certify

that the foregoing document is being served on all parties and the persons

identified below via transmission of Notice of Electronic Filing generated by

*CM/ECF*, which will automatically send email notification of such filing to the

counsel of record, or by causing it to be sent via First Class Mail.


Anna Mirshak Burns
Hans Christian Clausen
Federal Trade Commission-ATL
Atlanta Regional Office
Suite 1500
225 Peachtree Street, NE
Atlanta, GA 30303-1729

Anne Strom Infinger
Arnall Golden & Gregory
1201 West Peachtree Street
2800 One Atlantic Center
Atlanta, GA 30309

Katherine Dorothy Schuessler
Georgia Department of Corrections
Legal Office
2 Martin Luther King, Jr. Drive, S.E.
Suite 870, East Tower
Atlanta, GA 30334-4900

Robert J. Angres, Esq.
2650 Friesian Ct.
Reno, NV 89521-6228

John L. Arrascada, Esq.
Arrascada & Aramini, Ltd.
145 Ryland St.
Reno, NV 89501

Vadim Kruchinin a/k/a David Kruchin
5370 Vista Ridge Way
Reno, NV 89523-1825

This the 5th day of October, 2016.

LAW OFFICES OF HENRY F. SEWELL JR., LLC

*/s/ Henry F. Sewell, Jr.*
Henry F. Sewell, Jr.
Georgia Bar No. 636265
Counsel for the Receiver

Law Offices of Henry F. Sewell, Jr.
Suite 200, 3343 Peachtree Road NE
Atlanta, GA 30326
(404) 926-0053
hsewell@sewellfirm.com